# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FRONTIER SERVICES GROUP LIMITED,

          *Plaintiff*,

  v.

U.S. DEPARTMENT OF COMMERCE;
BUREAU OF INDUSTRY AND SECURITY;
END-USER REVIEW COMMITTEE; and
HOWARD LUTNICK, in his official capacity
as Secretary of Commerce,

          *Defendants*.

Case No.

## COMPLAINT

Plaintiff Frontier Services Group Limited, ("FSG"), brings this action against the U.S. Department of Commerce ("Commerce Department"), the Bureau of Industry and Security ("BIS"), the End-User Review Committee ("ERC"), and Howard W. Lutnick, in his official capacity as Secretary of Commerce ("Secretary Lutnick") (collectively, "Defendants"), and in support alleges and states as follows:

## I.    INTRODUCTION

1. FSG brings this action to challenge the Defendants' procedurally defective, *ultra vires*, and unconstitutional placement of FSG on the Commerce Department's Entity List. Defendants' actions have caused ongoing and irreparable harm to FSG's business operations and reputation. Defendants have never alleged that FSG engaged in unlawful conduct.

2. FSG is a publicly traded company, headquartered in Hong Kong. It operates in Greater China (mainland and Hong Kong), East Asia, South Asia, and Africa in a few main business sectors: Logistics, Security, Insurance, Infrastructure, and Healthcare.

3.      On or about June 14, 2023, the Commerce Department's BIS added FSG to the Entity List ("Entity List") pursuant to 15 CFR Part 744, under the destinations of China, Kenya, Laos, and the United Arab Emirates. Defendants did so based on the wholly false and unsubstantiated allegation that FSG was providing training to Chinese military pilots using "Western and NATO sources." *See* 88 Fed. Reg. 144 at 38739–38748 (June 14, 2023).

4.      Designation on the Entity List imposes U.S. trade restrictions on exports, reexports, and transfers of items subject to the Export Administration Regulations ("EAR"). FSG's placement on the Entity List, without further explanation, recourse, discussion, due process, or prospect of removal, has severely restricted its ability to conduct its ordinary business operations.

5.      Although FSG has never trained Chinese pilots or knowingly supported any entity that is training Chinese pilots (or which in the past has trained Chinese pilots), it nonetheless invested substantial resources in investigating and identifying the purported basis for Defendants' allegations in an effort to re-establish itself as a company in good standing. Moreover, FSG undertook proactive measures to remediate any potential grounds, as identified by its independent investigation, for Defendants' decision to place FSG on the Entity List.

6.      Ultimately, however, FSG was unable to detect any conduct "that could be or represent a significant risk of being contrary to the national security or foreign policy interests of the United States" and thus warrant its inclusion on the Entity List. *See* 15 C.F.R. § 744.11.

7.      FSG has sent Defendants numerous letters to open a dialogue between the parties and understand the basis for its inclusion so that it may take the necessary steps to effectuate its removal. To that end, FSG provided Defendants with a robust report detailing its history, global activities, regulatory framework, current ownership structure, comprehensive analysis of associated entities, examination of its compliance policies and suggestions of how to improve them, and more. In short, FSG proved, through independent investigation, that it was not involved

in any activities contemplated by 15 C.F.R. § 744.11. Further, FSG implemented affirmative measures to identify and resolve any operations that could reasonably be perceived as raising concerns. FSG documented these actions in its report and provided updates as to the same in subsequent letters to Defendants.

8.      Yet, to date, FSG has not received a substantive response or decision from BIS, *whatsoever*. Defendants' lack of responsiveness exacerbates the consequences of their baseless initial decision to list FSG on the Entity List, leaving FSG subject to an ongoing designation without recourse and without any meaningful or reasonable indication of review. Meanwhile, FSG's business operations, global workforce, and reputation continue to experience mounting and irreparable harm.

## II.      **JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 2201 (the Declaratory Judgment Act).

10.      This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 (the Declaratory Judgment Act), 5 U.S.C. § 702 (the Administrative Procedure Act), and the Court's inherent equitable powers.

11.      Venue is proper under 28 U.S.C. § 1391(b) and (e) because this is a civil action in which Defendants are federal agencies and federal officers acting in their official capacities, a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia, and Defendants reside in this district.

## III.      **PARTIES**

12.      Plaintiff FSG is a publicly traded company headquartered in Hong Kong.

13.      Defendant Commerce Department is an executive agency of the United States federal government that, among other functions, creates and enforces export regulations, including

the EAR. It publishes and maintains the Entity List. The Commerce Department amended the EAR by adding FSG to the Entity List. Its principal offices are in Washington, D.C.

14.    Defendant BIS is a component of the Commerce Department. BIS published the June 2023 Final Rule that placed FSG on the Entity List. Its principal offices are in Washington, D.C.

15.    Defendant ERC is a component of BIS within the Commerce Department. Its principal offices are in Washington, D.C. According to BIS's Entity List procedures, the ERC "makes all decisions regarding additions to, removals from, or other modifications to the Entity List." 87 Fed. Reg. at 77506.

16.    Defendant Secretary Lutnick, serving as the Secretary of Commerce, has his office in Washington, D.C. Secretary Lutnick is sued only in his official capacity. His predecessor was legally responsible for overseeing the placement of FSG on the Entity List, and Secretary Lutnick now maintains that list, pursuant to the Export Control Reform Act ("ECRA")'s mandate that the Secretary of Commerce "shall . . . establish and maintain" the Entity List. 50 U.S.C. § 4813(a)(2).

## IV.    GENERAL ALLEGATIONS

### A.    Statutory and Regulatory Background

17.    BIS is responsible for administering and maintaining certain U.S. export controls through the EAR, which govern exports of certain commodities, software, and technology. *See generally* 15 C.F.R. pts. 730–774.

18.    BIS maintains the Entity List under the ECRA's statutory directive that the Secretary of Commerce "shall . . . establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States pursuant to the policy set forth in section 4811(2)(A) of [Title 50 of the U.S. Code]." 50 U.S.C. § 4813(a)(2). Section 4811(2)(A), in turn, provides that "[t]he national security and foreign policy

4

of the United States require" controlling the "release of items" subject to the EAR for use in five enumerated contexts: "(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure."

19.     The release of "items" is exhaustively defined to mean "a commodity, software, or technology." 50 U.S.C. § 4801(7).

20.     BIS publishes the Entity List at Supplement No. 4 to Part 744 of Title 15 of the Code of Federal Regulations, as part of the EAR.

21.     Typically, companies and others placed on the Entity List cannot lawfully obtain items, software, and technology "subject to the EAR" without the exporter first securing a license from the Commerce Department.[1]

22.     Generally, items "subject to the EAR" are: (i) all items of U.S. origin; (ii) all items in or transiting through the United States; (iii) foreign-made commodities that contain a certain amount of controlled U.S.-origin content; or (iv) certain items, known as "foreign direct products," that are foreign-produced but which were created using (or made at a facility reliant on) certain U.S. software or technology. *See* 15 C.F.R. § 734.3(a)(1)-(5); *id.* § 734.9.

23.     When BIS adds entities to the Entity List, it also determines a "license review policy," which governs BIS's review of any application for a license to export to those entities. For listed entities, BIS commonly determines a license review policy of "presumption of denial" for all items subject to the EAR. That is the license review policy that BIS set for FSG when

---

[1] "'Subject to the EAR' is a term used in the EAR to describe those items and activities over which BIS exercises regulatory jurisdiction under the EAR. Conversely, items and activities that are not subject to the EAR are outside the regulatory jurisdiction of the EAR and are not affected by those regulations." 15 C.F.R. § 734.2(a)(1).

placing it on the Entity List.

24.     On information and belief, Defendants will deny all license applications for transactions involving FSG.

25.     Placement on the Entity List also carries secondary consequences with substantial financial repercussions, chief among them being the reputational stigma and financial difficulties that accompany inclusion on the Entity List. BIS has stated that "transactions of any nature with listed entities carry a 'red flag' and … U.S. companies [should] proceed with caution with respect to such transactions." Bureau of Indus. & Sec., Entity List FAQs (2020). Therefore, even for items not subject to the EAR, parties must generally conduct additional due diligence before transacting with a company on the Entity List. Such diligence can require significant compliance resources, which can deter prospective business partners from entering any relationship with companies on the Entity List. As a result, placement on the Entity List can effectively exclude a company from the U.S. market.

26.     In 2008, BIS issued a final rule that promulgated a new regulation, codified at 15 C.F.R. § 744.11, setting forth the standards governing decisions to add a party to the Entity List. *See* Authorization to Impose License Requirements for Exports or Reexports to Entities Acting Contrary to the National Security or Foreign Policy Interests of the United States, 73 Fed. Reg. 49311, 49312 (Aug. 21, 2008). This Final Rule also defined the procedures governing decisions about Entity List additions and removals, codifying them at Supplement No. 5 to Part 744 of the EAR ("Supplement No. 5"). *See* 73 Fed. Reg. at 49313, 49322-23.

27.     At all relevant times, 15 C.F.R. § 744.11(b) has provided that an entity (and those acting on its behalf) may be added to the Entity List if there is "reasonable cause to believe, based on specific and articulable facts," that the entity "has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security

or foreign policy interests of the United States . . .”

28.    At all relevant times, 15 C.F.R. § 744.11 has provided that the ERC “will follow the procedures set forth in” Supplement No. 5.

29.    Supplement No. 5 provides that the ERC “will make all decisions to make additions to, removals from or changes to the Entity List . . .” 15 C.F.R. pt. 744, Suppl. No. 5. Supplement No. 5 also provides that the ERC will be chaired by the Commerce Department and composed of representatives of the Departments of Commerce, State, Defense, Energy and, where appropriate, Treasury. *Id*. It further provides that the ERC “will make all decisions to add an entry to the Entity List…by majority vote,” and that it will make all decisions to remove or modify an entry by unanimous vote. *Id*.

30.    Supplement No. 5 does not empower any individual member agency or group of member agencies to add an entity to the Entity List without going through the ERC process. Instead, Supplement No. 5 provides that “[a]ny agency that participates in the ERC may make a proposal for an addition to, modification of, or removal of an entry from the Entity List,” which the agency is to do “by submitting that proposal to the chairperson.” *Id*. Supplement No. 5 then requires the ERC’s chairperson to circulate proposals to add, remove, or modify an Entity List entry to all member agencies for consideration and a vote by the ERC. *See id*.

31.    Supplement No. 5 establishes an internal escalation process in the event of interagency disagreement. If a member agency is not satisfied with the outcome of the ERC’s vote, the agency may escalate the matter to the Advisory Committee on Export Policy (“ACEP”). *Id.* A member agency that is not satisfied with ACEP’s decision may escalate the matter to the Export Administration Review Board (“EARB”). *Id.* Finally, a member agency that is not satisfied with the decision of the EARB may escalate the matter to the President of the United States. *Id*.

32.    Supplement No. 5 clarifies that although the ERC’s decision to add a party to the

Entity List must be made by majority vote, the decision need not be unanimous. *See id.*

33.    It is harder to get removed from the Entity List than it is to be placed on it. A listed entity can request removal, but the ERC can grant removal only by a unanimous vote, rather than by a simple majority vote. *See* 15 C.F.R. § 744.16(e); 15 C.F.R. pt. 744, Suppl. No. 5.

34.    When Congress enacted the ECRA in 2018, it included a transitional provision requiring that all EAR-related "delegations, rules, regulations, and other forms of administrative action" in place before ECRA's passage "shall continue in effect according to their terms until modified, superseded, set aside, or revoked under the authority of [ECRA]." 50 U.S.C. § 4826(a). As the D.C. Circuit has explained, this provision "statutorily endorsed those preexisting regulations" and related actions, "explicitly preserving [them] in law[.]" *Federal Express v. U.S. Dep't of Commerce*, 39 F.4th 756, 760 (D.C. Cir. 2022).

35.    Supplement No. 5's requirement that only the ERC, acting by majority vote, may add parties to the Entity List, as well as 15 C.F.R. § 744.11(b)'s "specific and articulable facts" standard governing additions to the Entity List, both preceded ECRA's enactment. Defendants have never revised the relevant portions of these provisions. Defendants are, therefore, bound by Congress's command that these regulations "shall continue in effect according to their terms." *See* 50 U.S.C. § 4826(a).

36.    Supplement No. 5 further states that a "listed entity may present a request to remove or modify its Entity List or the [Military End User] List entry along with supporting information . . ." Supplement No. 5 requires that the ERC's chairperson, the Commerce Department, "shall refer all such requests and supporting information to all member agencies," which agencies "will review and vote on all such requests." Supplement No. 5 further requires that a decision be made on the removal or modification request within 30 days, further obligating the chairperson to "prepare a response to the party who made the request . . . stat[ing] the decision on the request and the fact

that the response is the final agency decision on the request." That response must be signed by the

Deputy Assistant Secretary for Export Administration. 15 C.F.R. pt. 744, Suppl. No. 5.[2]

## B.   FSG

37.    FSG is a publicly traded company headquartered in Hong Kong and listed on the

Hong Kong Stock Exchange under ticker symbol "0500.HK".

38.    FSG operates across Greater China, East Asia, South Asia, and multiple African

jurisdictions, providing services primarily in logistics, security, insurance and infrastructure, and

healthcare. FSG conducts its operations through a network of subsidiaries tailored to local

regulatory and market conditions.

39.    FSG's origins trace back more than two decades and reflect a gradual evolution

across distinct business sectors. In 1999, Mr. Ko Chun Shun Johnson ("Ko"), a Hong Kong-based

businessman born in 1951, acquired a publicly traded Hong Kong company known as Capetronic

International Holdings Limited. The company was subsequently renamed DVB (Holdings)

Limited and later DVN (Holdings) Limited ("DVN"), reflecting its focus on digital video network

technologies.

40.    DVN was established as a technology and media business, engaged in the design

and manufacturing of TV set-top boxes to cater the migration of analog broadcasting to digital

broadcasting of the cable networks in China.[3] At the time, Motorola Incorporated was a significant

---

[2] BIS appears to have its own interpretation of the 30-day requirement and removal-request response that is incongruent with Supplement No. 5. For example, the BIS website's FAQs section states that "BIS conducts an internal review of all [removal] requests prior to referral to the ERC *that may add to this timeframe*." BIS Entity List FAQs, (available at https://www.bis.gov/media/documents/entity-list-faqs.pdf) (emphasis added). But that gatekeeping review and carveout to the 30-day requirement is nowhere in Supplement No. 5. BIS's FAQs also designate the "Principal Deputy Assistant Secretary for Export Administration" to provide a written decision, but that is not the agency position mandated by Supplement No. 5.

[3] At the time, the predecessor-in-interest of CITIC Group Corporation Ltd. ("CITIC Group") was a significant investor in China's cable TV infrastructure. To leverage CITIC Group's influence in the cable TV infrastructure, Ko invited a subsidiary of CITIC Group, which engaged in such business, to be DVN's primary shareholder, in return for purchase contracts for set-top boxes which DVN manufactured.

strategic shareholder of DVN as well. DVN's technology business proved commercially unviable and was ultimately sold to Cisco Systems in 2012.

41.     In or around 2013, Ko, following introductions by business associates, entered into a business relationship with Erik Prince ("Prince") to establish a transportation and logistics platform focused on frontier and emerging markets, particularly in Africa.

42.     In or around January 2014, Prince was appointed executive director and chairman of DVN, Ko became deputy chairman, and the company was renamed "Frontier Services Group Limited."

43.     After its rebranding as FSG, the company began acquiring and developing operating businesses and subsidiaries, Transit Freight Forwarding in South Africa, and Cheetah Logistics in the Democratic Republic of the Congo. These acquisitions formed the foundation of FSG's logistics and transportation platform, which was designed to support commercial operations in challenging operating environments.

44.     Today, FSG operates in Greater China (Mainland and Hong Kong), East Asia, South Asia, and Africa in a few main business sectors: Logistics, Security, Insurance, Infrastructure, and Healthcare. FSG's activities are organized through several subsidiaries. FSG **does not** conduct trade in "items" subject to the EAR.

45.     FSG is subject to comprehensive regulatory oversight. As a Hong Kong-listed company, it is regulated by the Securities and Futures Commission of Hong Kong and the Stock Exchange of Hong Kong Limited. FSG's financial statements are audited by Price Waterhouse Coopers, and the company has been represented by the law firm Baker & McKenzie. FSG maintains formal corporate governance structures consistent with applicable listing and disclosure requirements.

46.     FSG is governed by a 10-member Board of Directors, and its management team

consists of six senior executives. FSG's Board includes four committees, including the Risk Committee, which oversees the company's response to regulatory actions and ensures compliance with sanctions laws.

47.     FSG's ownership structure reflects its status as a publicly traded company. A subsidiary of CITIC Group holds approximately 25.28% of FSG's shares, while CITIC Capital Limited—an investment firm in which CITIC Group holds a minority interest—holds approximately 3.95%. Ko, through controlled entities and family holdings, owns approximately 11.27% of the company.

48.     More than 59% of FSG's shares are held by public investors, and the company operates independently of any single shareholder's control.

C.     **Defendants Add FSG to the Entity List**

49.     On or about June 14, 2023, the Commerce Department's BIS added FSG to the Entity List pursuant to 15 CFR Part 744, under the destinations of China, Kenya, Laos, and the United Arab Emirates. Defendants did so based on the wholly false and unsubstantiated allegation that FSG was "providing training to Chinese military pilots using Western and NATO sources." *See* 88 Fed. Reg. 144 at 38739–38748 (June 14, 2023).

50.     The Entity List designation came without warning or notice to FSG.[4]

51.     FSG's only affiliated company even remotely involved in the aviation sector, is a subsidiary of which FSG only owns 49% (the "Subsidiary"). The Subsidiary was not designated on the Entity List.

D.     **FSG's Independent Investigation Found No Significant Ties to Entities or Practices that Warrant Placement on Entity List.**

52.     Following its designation on the Entity List, FSG promptly retained undersigned

---

[4] FSG was never subjected to an outreach or end-use monitoring, despite BIS maintaining an Export Control Officer at the U.S. Consulate in Hong Kong.

counsel and Export Controls and Sanctions Advisors, LLC ("ECSA") (together, the "Legal Team") to conduct a comprehensive internal investigation and to assist FSG in developing an impartial and good faith delisting strategy. ECSA is staffed by former officials of the BIS and possesses substantial expertise in export controls and sanctions compliance.

53.     ECSA conducted an extensive and independent internal review of FSG, its operations, and its affiliates ("Investigation"), which culminated in an exhaustive report.  The investigation focused on several areas, including:

> (a) FSG's potential relationships with other entities designated on the same day and for the same stated reason;
> (b) FSG's subsidiaries and affiliates involved in aviation-related activities;
> (c) FSG's subsidiaries and affiliates whose activities might relate to the provision of pilot training;
> (d) FSG's current inventory of aircraft;
> (e) pilots working for or under FSG's corporate umbrella;
> (f) other potential business risks associated with FSG's aviation-related activities; and
> (g) any information suggesting a connection between FSG and either the AVIC International Flight Training Academy or the Test Flying Academy of South Africa.

54.      After this exhaustive review, the Legal Team was unable to identify any information directly supporting the allegations underlying FSG's designation.

55.     To the contrary, the investigation affirmatively established that FSG does not currently have, and has not had, any connection to the entities alleged by the federal government to have been involved in the training of Chinese military pilots.

56.     Focusing on the stated reason for its designation, the Legal Team determined that FSG's sole aviation-related connection consists of its 49% minority ownership interest in the Subsidiary. The Subsidiary is a company based in Nairobi, Kenya, which operates a fleet of

aircraft that provide search-and-rescue services and passenger charter operations for the United Nations, multiple Western governments, insurance companies, tourism operators, and private charter customers. Nor does the Subsidiary conduct trade in "items" subject to the EAR.

57.    Notably, though FSG was placed on the Entity List, the Subsidiary was not, and it continues to provide services to the United Nations. *Id.*

58.    The investigation also concluded that no entity affiliated with FSG has engaged in any conduct substantiating the allegations set forth in the Federal Register notice announcing FSG's designation. *See* U.S. Federal Register, Docket No. 230608-0146.

**E.    FSG's Repeated Attempts to Contact the Defendants**

59.    Since 2024, FSG has contacted Defendants on four separate occasions to engage Defendants regarding its designation on the Entity List. Through written correspondence, FSG sought to initiate a dialogue and explain what it reasonably believes to be a misunderstanding, remediate any concerns Defendants purportedly relied upon in making the designation, and secure its removal from the Entity List. To date, the Defendants have not materially or substantively responded.

60.    First, on or about January 17, 2024, FSG, through undersigned counsel, sent Defendants a letter notifying them that FSG had retained U.S. counsel and was undertaking a comprehensive investigation to assess and address Defendants' allegations. The letter further advised that, upon completion of the investigation, FSG intended to submit a formal petition for removal from the Entity List.

61.    Defendants did not respond.

62.    Second, on or about September 13, 2024, FSG submitted its formal petition for removal to Defendants. The petition included the Legal Team's Report and expressly offered to provide any additional information Defendants might require.

63.     Defendants, again, did not respond.

64.     On or about November 1, 2024, FSG sent a 30-day update email to ERC Chairperson Carmen Quesenberry ("Quesenberry"). Quesenberry responded that she had received the email but did not otherwise provide a substantive response to FSG's removal request.

65.     On or about February 18, 2025, FSG sent a third letter informing Defendants that it was in the process of implementing a comprehensive new Compliance Policy, enhanced compliance frameworks, and enterprise-wide risk-mitigation measures. FSG again requested a meeting to address any remaining concerns or to discuss the steps necessary to achieve de-listing.

66.     Defendants did not respond.

67.     On or about July 16, 2025, FSG sent a fourth letter reiterating its prior requests and updating Defendants on the substantial and far-reaching measures it had taken, and continued to take, to ensure adherence to the most rigorous compliance standards.

68.     Defendants again did not respond.

69.     On or about December 15, 2025, FSG sent another letter in support of its removal petition, which elicited an automated receipt message from the ERC. No substantive response to FSG's letter followed the automated receipt notice.

70.     At the time of filing, Defendants have not provided any substantive response whatsoever.

71.     On information and belief, the Defendants have not, as required by Supplement No. 5: (i) referred FSG's removal request and supporting information to all member agencies; (ii) rendered a decision (of any kind, including a final agency decision) on the removal request; nor (iii) prepared a response to FSG signed by the Deputy Assistant Secretary for Export Administration.

72.     Defendants' refusal to engage in any discussion with FSG and failure to comply

with their statutory and regulatory obligations, including those in Supplement No. 5, are violations of due process further demonstrating that FSG's designation is meritless.

**F. <u>Harm</u>**

73.    Defendants' *ultra vires* actions, malfeasance, and multiple failures to abide by governing statues and regulations, directly and proximately caused significant harm to FSG as well as its subsidiary companies, which harms in turn flow to FSG.

74.    These harms to FSG continue to accrue, and include but are not limited to:

a. Lost revenue due to import and export restrictions;

b. Lost business opportunities, including but not limited ceased business and ruined business relationships in the aviation sector;

c. Capital losses, including but not limited to the Subsidiary's inability to source parts and maintenance for aircraft, and corresponding damage and loss to aircraft;

d. Reputational damage;

e. Depreciation in share price (over 60 percent depreciation) and other capital markets damage;

f. Disrupted business relationships, including but not limited to with banks and financial partners and counterparties;

g. Bank account closures and other disruptions in capital and monetary flows through the global financial system;

h. Increased legal, compliance and other related costs; and

i. Increased costs relating to the diversion and expenditure of finite business and management resources, as well as board of directors resources.

## V.    CAUSES OF ACTION

### COUNT I
*Ultra Vires* Agency Action
(Violation of ECRA's Entity List Criteria)

75.    FSG realleges and incorporates by reference the allegations contained in paragraphs 1 through 74.

76.    Defendants acted *ultra vires* by adding FSG to the Entity List on vague allegations of "providing training to Chinese military pilots using Western and NATO sources[,]" allegations not grounded in any specific conduct and unmoored from Congress's narrow statutory criteria.

77.    50 U.S.C § 4811(2)(A) provides that "[t]he national security and foreign policy of the United States require" controlling "the release of items" subject to the EAR for use in five specific areas: "(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure."

78.    Defendants have never alleged (and on information and belief, have never found) that FSG engaged in any of the activities enumerated in section 4811(2)(A)—with or without items subject to the EAR.

79.    Defendants have never alleged (and, on information and belief, have never found) that FSG aided or abetted third parties engaged in activities enumerated in section 4811(2)(A)—with or without items subject to the EAR.

80.    Instead, Defendants placed FSG on the Entity List based on it purportedly "providing training to Chinese military pilots using Western and NATO sources."

16

81.     Rather, on information and belief, the June 2023 Final Rule's assertion that FSG "provid[ed] training to Chinese military pilots using Western and NATO sources" was based solely on (1) an intent to adversely affect and damage FSG in the global marketplace for reasons outside imposing a licensing requirement on "items" and otherwise enforcing the EAR, and (2) based on the hypothetical risk that FSG's Subsidiary's aviation business might somehow provide training to Chinese pilots in the future.

82.     The Defendants are not permitted to use the EAR for purposes outside regulating "items" subject to the EAR. And, a generic hypothetical risk based on no specifically cited conduct is not among the grounds enumerated in section 4811(2)(A).

83.     The authority conferred to the Commerce Department in section 4813(a)(16) to "undertake any other action as is necessary to carry out this subchapter that is not otherwise prohibited by law[,]" does not encompass adding entities to the Entity List based on general federal government disfavor of a company, generic discrimination against another sovereign, a generic risk to certain parties on the Entity List, or for reasons other than those enumerated in section 4811(2)(A).

84.     Accordingly, Defendants acted *ultra vires* in adding FSG to the Entity List.

85.     Defendants' unlawful acts have caused, are causing, and will continue to cause, harm to FSG.

### COUNT II
Violation of Due Process and Federal Common Law – *Accardi*
(Violating Entity List Procedures)

86.     FSG realleges and incorporates by reference the allegations contained in paragraphs 1 through 74.

87.     To the detriment of FSG, Defendants added FSG to the Entity List and refused to follow Supplement No. 5's removal-request procedures, in violation of BIS's Entity List regulatory procedures and criteria, thereby violating the rule-of law principles articulated in *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), and its progeny. *See also Service v.*

17

*Dulles*, 354 U.S. 363, 388 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959); *Yellin v. United States*, 374 U.S. 109, 123–124 (1963). This, in turn, violated the Fifth Amendment's Due Process Clause and federal common law.

88.    Under *Accardi* and its progeny, federal agencies and their officials must follow their own rules and regulations, even self-imposed procedural rules that limit otherwise discretionary decisions, particularly where those provisions provide the only safeguard that private parties have against unconstrained agency discretion. As this Court and others have recognized, *Accardi*'s rule-of-law principles may be enforced through substantive due process claims as well as standalone claims, independently of the Administrative Procedure Act.

89.    FSG is entitled to the process due under the U.S. Constitution because of its Subsidiary's substantial connections with the United States.

90.    On information and belief, Defendants violated 15 C.F.R. § 744.ll(b)'s requirement that parties be added to the Entity List only if there is "reasonable cause to believe, based on specific and articulable facts," that the party "has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States." For over two years, Defendants have declined to articulate any such facts about FSG.

91.    Upon information and belief, the Defendants have also violated Supplement No. 5 by: (i) failing to refer FSG's removal request and supporting information to all member agencies; (ii) failing to render a decision (of any kind, including a final agency decision) on the removal request within 30 calendar days; and (iii) failing to prepare a response to FSG signed by the Deputy Assistant Secretary for Export Administration. Indeed, per BIS's published policies and FAQs, Defendants appear to have created their own exception to Supplement No 5's 30-day removal-request-decision timeframe by building in an "internal review" period of indefinite length.

92.     Supplement No. 5's procedures and 15 C.F.R. § 744.ll(b)'s criteria protect private parties as well as the government's own interests by helping "provide reasonable safeguards against capricious interagency behavior," *see* 73 Fed. Reg. at 49316, and promoting "consisten[cy] with the [Entity List] criteria set forth in [15 C.F.R.] § 744.11," *see id*. at 49318.

93.     Defendants' unlawful acts have caused, are causing, and will continue to cause, harm to FSG. Defendants' violations of agency regulations have also substantially prejudiced FSG by depriving them of these safeguards against agency caprice and inconsistency.

<u>**COUNT III**</u>
*Ultra Vires* Agency Action
(Violation of ECRA's Entity List Criteria)

94.     FSG realleges and incorporates by reference the allegations contained in paragraphs 1 through 74.

95.     Defendants also acted *ultra vires* in adding FSG to the Entity List on vague grounds, not rooted in any specific conduct and unmoored from Congress's narrow statutory criteria.

96.     Section 4811(2)(A) of Title 50 of the U.S. Code provides that "[t]he national security and foreign policy of the United States require" controlling "the release of items" subject to the EAR for use in five specific areas: "(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure."

97.     Defendants have never alleged (and on information and belief, have never found) that FSG engaged in any of the activities enumerated in section 4811(2)(A)—with or without items subject to the EAR.

98.     Defendants have never alleged (and, on information and belief, have never found) that FSG aided or abetted third parties engaged in activities enumerated in section 4811(2)(A)—with or without items subject to the EAR.

99.     Instead, Defendants placed FSG on the Entity List based on its purportedly "providing training to Chinese military pilots using Western and NATO sources."

100.     The authority conferred on the Secretary of Commerce in section 4813(a)(16)—to "undertake any other action as is necessary to carry out this subchapter that is not otherwise prohibited by law"—does not encompass adding entities to the Entity List based on training foreign pilots. The stated reason for the June 2023 Entity List designation has nothing to do with "the release of items." Thus, the supporting reason is for reasons other than those enumerated in section 4811(2)(A).

101.     Accordingly, Defendants acted *ultra vires* in adding FSG to the Entity List.

102.     Defendants' unlawful acts have caused, are causing, and will continue to cause, harm to FSG.

## <u>COUNT IV</u>
Violation of Non-Delegation Doctrine

103.     FSG realleges and incorporates by reference the allegations contained in paragraphs 1 through 74.

104.     The U.S. Constitution vests Congress with "[a]ll legislative powers." U.S. Const. art. I, § 1.

105.     Congress may grant legislative power to an agency only if it provides an "intelligible principle" by which the agency can exercise that power. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

106.     Upon information and belief, Defendants listed FSG in reliance on purported statutory authority from 50 U.S.C. § 4813(a)(16), which grants the Commerce Department

discretion to "undertake any other action as is necessary to carry out" export control "that is not otherwise prohibited by law."

107.    Congress failed to provide any guidance or intelligible principle whatsoever for how the Commerce Department (or its delegees) should exercise the discretion Congress conferred on it in section 4813(a)(16).

108.    Defendants thus have unfettered discretion under section 4813(a)(16) to make listing decisions based on any conduct they deem objectionable.

109.    Congress's delegation to the Commerce Department of authority to add entities to the Entity List, unconstrained by an intelligible principle, violates Article I of the U.S. Constitution.

110.    Defendants' unlawful acts taken pursuant to section 4813(a)(16) have caused, are causing, and will continue to cause harm to FSG.

### COUNT V
Violation of Due Process – Void for Vagueness

111.    FSG realleges and incorporates by reference the allegations contained in paragraphs 1 through 74.

112.    Both on its face and as applied to FSG, 15 C.F.R. § 744.11(b)(5)—Defendants' asserted basis for listing FSG—is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment because it fails to provide fair notice of the conduct it purports to prohibit, and it fails to limit enforcement discretion, allowing for arbitrary and discriminatory application.

113.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012).

114.    The Due Process Clause "promise[s] that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain

line is passed.'" *Bittner v. United States*, 598 U.S. 85, 102 (2023) (joint op. of Gorsuch and

Jackson, JJ.) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). "[T]he void for

vagueness doctrine addresses at least two connected but discrete due process concerns: first, that

regulated parties should know what is required of them so they may act accordingly; second,

precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or

discriminatory way." *Fox*, 567 U.S. at 253.

115.    FSG is entitled to the process due under the U.S. Constitution because of its

Subsidiary's substantial connections with the United States.

116.    A reasonable actor in FSG's position, seeking to comply with U.S. law when selling

products in the open market, would have had no notice that anything it was doing would subject it

to the risk of being added to the Entity List.

117.    The June 2023 Final Rule stated that FSG was added to the Entity List purportedly

for "providing training to Chinese military pilots using Western and NATO sources." "This

activity," the Final Rule asserted, "is contrary to U.S. national security and foreign policy interests

under [15 C.F.R.] § 744.11(b)."

118.    This stated rationale is a modified recitation of 15 C.F.R. § 744.11(b)(5), which

identifies one of Section 744.11(b)'s "illustrative ... activities" warranting Entity List placement.

Subsection (b)(5) concerns "[e]ngaging in conduct that poses a risk of violating the EAR when

such conduct raises sufficient concern that the End-User Review Committee believes that prior

review of exports, reexports, or transfers (in-country) involving the party and the possible

imposition of license conditions or license denial enhances BIS's ability to prevent violations of

the EAR." 15 C.F.R. § 744.11(b)(5).

119.    Section 744.11(b)(5) is unconstitutionally vague on its face, because "[the]

regulation … is unclear as to what fact must be proved" and thereby fails to give "sufficient notice

of what is proscribed." *Fox*, 567 U.S. at 253–54. Specifically, the relevant statutory and regulatory framework does not define what "conduct" possibly "raises sufficient concern that the End-User Review Committee believes that prior review of exports, reexports, or transfers (in-country) involving the party and the possible imposition of license conditions or license denial enhances BIS's ability to prevent violations of the EAR." *See* 15 C.F.R. § 744.11(b)(5).

120.    Additionally, the phrase "raises sufficient concern" is undefined, subjective, and applied by Defendants through undisclosed criteria. Nor have Defendants issued any authoritative guidance about what conduct gives rise to an unacceptable risk of EAR violations under this provision. Without such clear standards, section 744.11(b)(5) provides no fair warning by which regulated parties can distinguish between conduct that does or does not warrant placement on the Entity List. It thereby gives no notice to regulated parties about how to conform their conduct to the law, and gives Defendants unfettered discretion to impose severe sanctions through arbitrary and discriminatory application.

121.    Section 744.11(b)(5) is also unconstitutionally vague ***as applied*** to FSG, because it failed to give them fair notice that Defendants could add them to the Entity List for no specific instances at all. Although the June 2023 Final Rule used the phrase "[t]his activity" when listing FSG, it speaks only of training Chinse military pilots categorically and does not cite any specific instances of that conduct by FSG. Moreover, the phrase "using Western and NATO sources" is undefined, confusing, and ambiguous.

122.    Similarly, the statutory and regulatory framework does not indicate that such conduct would amount to "conduct" that "raises sufficient concern that the End-User Review Committee believes that prior review of exports, reexports, or transfers (in-country) involving the party and the possible imposition of license conditions or license denial enhances BIS's ability to prevent violations of the EAR." *See* 15 C.F.R. § 744.11(b)(5).

123.     The arbitrariness of Defendants' enforcement of section § 744.11(b)(5) is corroborated and further underscored by the fact that FSG's only subsidiary company that operates in the aviator sector in Africa is not designated on the Entity List.

124.     Defendants' unlawful actions taken pursuant to section 744.11(b)(5) have caused, are causing, and will continue to cause harm to FSG, through both the "legal consequence" and "reputational injury" of the placement on the Entity List. *See Fox*, 567 U.S. at 255.

## COUNT VI
Violation of Due Process – Lack of Notice and Hearing

125.     FSG realleges and incorporates by reference the allegations contained in paragraphs 1 through 74.

126.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that no person "shall...be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

127.     The fundamental requirement of due process is adequate notice and the opportunity to be heard at a meaningful time and in a meaningful manner when being deprived of property or liberty interests. *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976).

128.     FSG is entitled to the process due under the U.S. Constitution because of its Subsidiary's substantial connections with the United States.

129.     The addition of FSG to the Entity List, and resulting restrictions on commerce, deprived FSG of its property and liberty interests. These deprivations include, without limitation, (a) FSG's property interest in the economic viability of its subsidiaries; (b) FSG's liberty interests in carrying out and growing its chosen businesses, which placement on the Entity List has broadly precluded it from doing; (c) FSG's liberty interests in contracting with U.S. business partners; and (d) FSG's liberty interests in its reputation and professional goodwill.

130.    FSG was entitled to due process before it was deprived of these Constitutionally protected interests. That process includes, at a minimum, the right to notice of the basis for Defendants' decision to add FSG to the Entity List, and a meaningful opportunity to be heard, including an opportunity to rebut whatever evidence Defendants purportedly relied upon when accusing FSG of "providing training to Chinese military pilots using Western and NATO sources."

131.    FSG was not given adequate process. It received no notice of FSG's addition to the Entity List before its announcement on or about June 14, 2023.

132.    Over two years later, FSG is still waiting for Defendants to reveal what, if any, evidentiary basis they relied upon in adding FSG to the Entity List on the purported basis of "providing training to Chinese military pilots using Western and NATO sources."

133.    Listing FSG was not urgent and giving it advanced notice of the reasons for the listing would not have been impractical.

134.    FSG also received no meaningful post-deprivation notice or opportunity to be heard. In correspondence after correspondence written to Defendants, FSG and its representatives sought information about what FSG did to warrant placement on the Entity List and requested guidance about what it could do to get off the Entity List—to no avail. Because FSG has received no information about the basis for Defendants' assertion about FSG's purported "providing training to Chinese military pilots using Western and NATO sources," FSG has had no meaningful opportunity to rebut that assertion.

135.    Moreover, the Entity List removal procedures, according to BIS's interpretation, do not state a definitive deadline for Defendants to render a decision on a removal request. The removal request by FSG has been pending for more than *two and a half years*, and Defendants have not provided any guidance about whether or when they will ever render a decision.

136.    The placement of FSG on the Entity List is, therefore, unconstitutional because it

deprived FSG of its liberty and property rights without due process.

137.    Defendants' unlawful acts have caused, are causing, and will continue to cause harm to FSG.

## COUNT VII
### Writ of Mandamus (In the Alternative)

138.    FSG realleges and incorporates by reference the allegations contained in paragraphs 1 through 74.

139.    This claim is brought under 28 U.S.C. § 1361, which grants this Court original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff.

140.    The Defendants are officers or agencies of the United States within the meaning of 28 U.S.C. § 1361.

141.    Defendants have a clear, ministerial, and non-discretionary duty to (i) refer FSG's removal request and supporting information to all member agencies; (ii) render a decision (including a final agency decision) on the removal request; and (iii) prepare a response to FSG signed by the Deputy Assistant Secretary for Export Administration.

142.    FSG has a clear and indisputable right to performance of this duty because FSG is currently on the Entity List.

143.    Defendants have failed and refused to perform this duty, and have unreasonably delayed its performance, despite FSG's repeated requests and the passage of over two years.

144.    Defendants' failures to act are not matters of discretion but rather constitute an unlawful withholding of legally required agency action.

145.    FSG has no other adequate remedy at law to compel Defendants to perform the required duty.

146.    Defendants' failures to act have caused FSG ongoing and irreparable harm,

including but not limited to financial harm, loss of rights (including Constitutional rights), regulatory paralysis, and an inability to proceed with business.

147.    The balance of equities favors FSG, and issuance of a writ of mandamus would further the public interest by ensuring compliance with federal law and preventing arbitrary agency inaction.

148.    Defendants' continued refusal and failure to perform its mandatory duty is unlawful, capricious, and contrary to law.

## REQUESTS FOR RELIEF

**WHEREFORE**, FSG requests that this Court:

a.    Order Defendants to produce the basis for adding FSG to the Entity List and whatever evidence upon which Defendants relied in making that determination, in the form of the administrative record, consistent with Local Civil Rule 7(n);

b.    Declare that Defendants' placement of FSG on the Entity List was *ultra vires*;

c.    Declare that Defendants violated the Due Process Clause of the Fifth Amendment to the U.S. Constitution, and acted otherwise contrary to law when they added FSG to the Entity List;

d.    Declare that 50 U.S.C. § 4813(a)(16) constitutes an unlawful delegation of legislative power;

e.    Declare that 15 C.R.R. § 744.11(b)(5) is void for vagueness on its face and as applied to FSG;

f.    Order Defendants to remove FSG from the Entity List;

g.    Vacate the portion of June 14, 2023, Final Rule placing FSG on the Entity List;

h.    Enjoin Defendants from implementing or enforcing FSG's Entity List designation;

i.    In the alterative, declare that the Defendants have unlawfully withheld or

unreasonably delayed in resolving FSG's removal request from the Entity List, issue a writ of mandamus compelling the Defendants to immediately review and issue a decision on FSG's removal;

j.   Award FSG their costs and reasonable attorney fees incurred in this action; and

k.   Grant such other relief as the Court may deem just and proper.


Dated: March 2, 2026

Respectfully submitted:


**STUMPHAUZER KOLAYA
NADLER & SLOMAN PLLC**
2 S. Biscayne Blvd., Suite 1600
Miami, Florida 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Michael B. Nadler*
Michael B. Nadler (DC Bar #
90037086)
Email: mnadler@sknlaw.com

*Counsel for FSG*